## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 18 2016, 6:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Andrew J. Sickmann
Richmond, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

K.C. and K.C.,

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 18, 2016

Court of Appeals Case No.
89A01-1604-JT-913

Appeal from the Wayne Superior Court

The Honorable Darrin M. Dolehanty, Judge

Trial Court Cause No.
89D03-1512-JT-42

**Altice, Judge.**

## Case Summary

[1] K.C. (Mother) and K.C. (Father) (collectively, Parents) appeal the involuntary termination of their parental rights to J.C. (Child). Parents challenge the sufficiency of the evidence supporting the termination of their rights.

[2] We affirm.

## Facts & Procedural History

[3] Child was born to Parents in July 2007. Mother is a drug addict and Father is an alcoholic. Since Child's birth, Parents have been convicted of a number of crimes and have been incarcerated off and on. Specifically, Father was convicted of resisting law enforcement (January 2010), public intoxication (February 2010), trespass (October 2012), and intimidation, neglect of a dependent, and disorderly conduct, as well as adjudicated a habitual offender (December 2013). Additionally, he was incarcerated at the time of the fact-finding hearing in this case for events that occurred in January 2016. Similarly, Mother has been convicted, since her son's birth, of possession of paraphernalia and battery (June 2012), conversion (July 2012), theft (January 2013), neglect of a dependent (February 2014), and burglary (October 2015).[1] She is currently incarcerated with an expected release date of October 27, 2019.

---

[1] Mother has been incarcerated approximately twenty times as an adult, and Child was the victim in Mother's neglect offense. Father's earlier, unrelated conviction for neglect of a dependent also involved Child as his victim.

[4] The Indiana Department of Child Services (DCS) removed Child from his home on or about October 3, 2013, and Child has not been returned to the care of Mother or Father since that date. He has remained in the care of the same foster family throughout the underlying CHINS and termination proceedings. The reason for the removal was Mother's admitted use of cocaine, marijuana, and opiates, as well as Father's incarceration.

[5] Child was adjudicated a CHINS, and a dispositional order was entered on November 4, 2013. Parents were ordered to, among other things, cooperate and keep all appointments with service providers, refrain from using alcohol or drugs, submit to random drug/alcohol screens, secure and maintain a legal and stable source of income, and participate in a mental health evaluation and individual counseling. Due to Father's continued incarceration, he was not able to participate in most services until his release in February 2015.

[6] DCS provided Mother with substantial services to help combat her addiction and assist with parenting and life skills. Mother entered and completed an inpatient drug treatment program in April 2014. She did pretty well coming out of treatment and was engaged with services for a couple of months. Except for her period of inpatient treatment, Mother lived in a homeless shelter from February to November 2014.

[7] Around July 2014, Mother again began struggling with attitude and attendance at sessions with her recovery coach, Cortney Baudendistal. Mother continued to miss appointments and did not see Baudendistal at all after February 2015.

Similarly, Mother missed about half of her meetings with her addiction and mental health therapist, Betty Hancock, and was discharged from this service in January 2015 due to attendance issues. During counseling sessions, Mother informed Hancock that she was once again using cocaine and heroin. According to Hancock, the little progress Mother had made was lost once she started using again.

[8] Becky Studebaker, the executive director of the homeless shelter at which Mother stayed, testified that Mother eventually "took a bad spin for the worst" and was asked to leave the shelter in November 2014. *Transcript* at 93. Studebaker indicated that in addition to positive drug screens, there were allegations that Mother was stealing from the shelter and was having conflicts with staff and other residents.

[9] Family case manager (FCM) Megan Fisher testified that Mother tested positive for cocaine in November and December 2014, as well as February and March 2015. After testing positive in March, Mother informed FCM Fisher that she "had lost the will to fight". *Id*. at 102. In addition to using cocaine, Mother began to miss visits with Child in March 2015 and by April ceased participating in all services. Mother was arrested for burglary on April 28, 2015, and has not visited with Child since due to her incarceration. Mother was subsequently convicted of Level 4 felony burglary and sentenced to six years in prison, consecutive to a misdemeanor sentence in a separate case. Her projected release date is October 27, 2019.

[10] Shortly before Mother's burglary arrest, Father was released from prison in February 2015 after serving over two years. He stayed at a mission in Muncie for a short time and then moved back to Richmond in March. Father contacted FCM Fisher upon his return and was referred to services. By April 21, 2015, Father had completed an evaluation for substance abuse and started counseling. He was also employed, consistently visiting Child, and had obtained housing. Father and Child quickly developed a bond.

[11] Father worked closely with Rodney Barbee, a case manager for the Engaging Fathers program. Barbee worked with Father on developing life skills and often supervised visits between Father and Child. Barbee provided transportation for Father, as Father is not allowed to drive. Visits between March and December 2015 went well and eventually required very little supervision.

[12] Father's initial residence was next to the carwash at which he worked. FCM Fisher visited the home and discovered that it had no electricity. Father then moved to an apartment above the carwash in April or May 2015. In addition to no electrical service, this apartment did not have running water, a kitchen or area for food preparation, or a bathroom. Father had to use the restroom downstairs in the car wash.

[13] FCM Scarlett Hughes was assigned to the case in November 2015. She met with Father to discuss the main barriers to reunification with Child. FCM Hughes identified those as being that Father still needed to obtain appropriate housing and find some form of legal transportation.

[14] Father last visited with Child on December 25, 2015. The visit was supervised by Karen Bowen, the director of the Wayne County CASA program, and took place at Father's residence above the carwash. Bowen observed that Child and Father did not talk much during the visit but seemed comfortable with each other. Father had gifts for Child but no food. Bowen was concerned by some of the individuals who dropped by the residence, as she knew two of them to be drug users. Further, Bowen indicated that people just walked in and hung out throughout the visit.

[15] In general, Bowen believed that Father was heading in the right direction and just needed to become less reliant on service providers. Father's progress, however, was derailed when he was arrested on January 1, 2016. On that date, Captain Robert Lipps of the Richmond Police Department was dispatched to an automobile wreck near the carwash. Father indicated that he was driving when he backed into another vehicle. Captain Lipps noticed the odor of alcohol coming from Father. Officer Sergio Santiago also responded to the scene and observed signs of intoxication, including slurred speech and very unsteady balance. Officer Santiago placed Father, a habitual traffic violator, under arrest.

[16] This cause of action represents the second time that a petition to terminate parental rights has been litigated between the parties. The fact-finding hearing for the first, Cause No. 89D03-1504-JT-12 (Cause JT-12), was held in June 2015, about four months after Father's release from prison. The trial court entered a lengthy order in Cause JT-12 on June 29, 2015, in which it denied the

petition to terminate parental rights. With regard to Mother, the court noted her long-standing substance abuse issues and ongoing pattern of criminal conduct, which had resulted in her being in and out of jail regularly over the prior three years. The court found clear and convincing evidence that Mother would not be able to overcome the conditions that led to Child being removed from her home and that allowing her to continue to parent Child would pose a threat to Child's well-being. The court, however, declined to reach the same conclusion as to Father. The court explained:

> For a substantial portion of this child's life, and most significantly for the past three years, father has been almost entirely absent from this child's life. While letters from prison may be cathartic for the father, they do not even remotely approximate the child's need to have a direct, immediate and meaningful interaction with his father on a daily basis, during the crucial formative years of his life. Father's absence, and the relationship void created through that absence, cannot be overlooked, and will unfortunately have a lasting and negative impact on the child's psyche. Nonetheless, since his release from incarceration in mid-February of this year, the father has complied with all referred services, has not missed a single opportunity to visit with the child, has not tested positive for use of illegal substances, has not committed further crimes, has obtained employment and a residence, and has interacted appropriately with his son. The evidence has not shown that father's relationship with this child poses a threat to the child's well-being. The evidence supports a conclusion that there is more than a reasonable probability that father will be able to meaningfully address and correct the conditions that have resulted in the child's placement outside of the home.

Granted, the father's remarkable "come-back" has been for the short-term. The child is nearly eight (8) years old, and the father's efforts to properly parent the child have come over the past 18 weeks. Further, during that short period, the overall interaction – the overall parenting has been for a pittance of hours, with visits occurring twice a week and comprising 3% of the child's time. Nonetheless, in a matter of such grave importance, it is imperative that the evidence be clear; that the evidence be convincing, that the father not adequately address years of prior parenting shortfalls. Here, the evidence does not support that conclusion.

*Vol. of Exhibits* at 28-29. Accordingly, despite its findings with respect to Mother, the court denied the termination petition as to both Mother and Father.

[17] After Cause JT-12 concluded in Parents' favor, Father continued making positive steps through December 2015. He remained employed at the carwash, continued in services, and regularly visited Child. The visits progressed from fully to partially supervised. Father was also attending AA meetings for a period of time. Father, however, remained without the ability to provide his own transportation and continued to lack appropriate housing. Father last visited Child on December 25, 2015, and last spoke with Child three days later. Father found himself once again incarcerated beginning in January 2016, with evidence that he was drinking alcohol again and driving without a license.

[18] On December 21, 2015, DCS filed the instant petition to terminate Parents' parental rights to Child. The fact-finding hearing took place on March 11, 2016. Parents both remained incarcerated at the time – Mother in the Rockville

Correctional Facility and Father in the Wayne County Jail. On March 24, 2016, the trial court entered another detailed order but this time ordered the termination of Parents' parental rights to Child. Parents now appeal. Additional facts will be presented below as needed.

## Discussion & Decision

[19] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[20] The trial court entered findings in its order terminating Parents' parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* Because Parents do not challenge any of the trial court's findings, we will address only the second step. A judgment is clearly erroneous if the findings do not support the court's conclusions or the

conclusions do not support the judgment thereon. *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996).

[21]  We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[22]  Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[23] On appeal, Parents argue that the evidence is insufficient to support the involuntary termination of their parental rights. Parents first challenge the trial court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the trial court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Parents' care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions that led to Child's placement and retention in foster care will not be remedied.

[24] In making a determination in this regard, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re E.M.*, 4 N.E.3d 636,

643 (Ind. 2014). The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* Further, the court may consider the parent's history of neglect and response to services offered through DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

[25] DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id*.

[26] The result in this case is particularly tragic because Mother and Father clearly love and are bonded with Child, and Child desires to be with one or both of them. The record establishes, however, that Parents have been given ample time to remedy the conditions that have resulted in Child's placement and retention in foster care and to establish that they can safely parent and provide for Child. Most notably, Parents needed to remain free of alcohol and drugs, not commit new criminal offenses, and obtain suitable housing and employment.

[27] With respect to Mother, the trial court concluded that there existed clear and convincing evidence that there is a reasonable probability that the conditions that led to Child's removal will not be remedied. Indeed, the evidence establishes that Mother has a long-standing cocaine problem that she has been unable to overcome and an ongoing pattern of criminal behavior. Despite completing inpatient treatment and apparently remaining drug-free for several months, she began using cocaine again in late 2014 and started another downward spiral. In March 2015, after missing many appointments with service providers, Mother informed FCM Fisher that she had lost the will to fight. Mother last used cocaine on the date of her arrest for burglary, April 21, 2015, and had ceased participating in all services by that date. The trial court observed that the only change in Mother's status since June 2015 was that at the first termination hearing she was in jail on a pre-trial basis and now she has been convicted of the Level 4 felony burglary and will remain in prison until October 27, 2019. Child will be twelve years old by that date. The trial court's conclusion is overwhelmingly supported by the evidence.

[28] Regarding Father, the trial court also found clear and convincing evidence of a reasonable probability that the conditions that resulted in Child's removal and the reasons for placement outside Father's home will not be remedied. The trial court acknowledged Father's positive progress between June and December 2015, which unfortunately ended with the events of January 1, 2016. On this date Father caused an automobile accident while under the influence of alcohol, despite the fact that he should not have been driving or drinking.

Father was incarcerated again and had not seen or spoken with Child since December 28, 2015. He remained in jail at the time of the final hearing – once again unable to parent Child due to incarceration – and his release date is unclear. Further, at the time of his arrest, Father had still not obtained suitable and safe housing despite being employed and receiving services for approximately nine months.

[29] In entering its conclusion regarding Father, the trial court explained:

> The Court does not conclude that there is an <u>absolute</u> absence of hope that Father might someday successfully avoid the issues that he continues to create for himself, mostly through repeated periods of incarceration. Nonetheless, the evidence clearly and convincingly supports a *reasonable probability* that Father will not be able to remedy the obstacles to reunification with his son.

*Appendix* at 73 (emphases in original). The trial court's conclusion in this regard is not clearly erroneous.[2]

[30] Having determined that the trial court's conclusion that there is a reasonable probability the conditions resulting in Child's removal and continued placement

---

[2] Parents' attempt to liken this case to *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009), a case in which our Supreme Court reversed the termination of a mother's parental rights, is unavailing. In *G.Y.*, the mother's convictions were all committed before her child's conception. The Court observed that after that time and for the first twenty months of the child's life, "the record gives no indication that Mother was anything but a fit parent." *Id.* at 1262. After her incarceration and her child's adjudication as a CHINS, the mother "took positive steps and made a good-faith effort to better herself as a person and as a parent." *Id.* Despite her incarceration, she remained committed to maintaining a relationship with her child and reunifying with him upon her release. Further, her release from prison was imminent, and she had already secured suitable housing and employment. *Id.* at 1265. Parents are far from on equal footing with the mother in *G.Y.*

outside Parents' home will not be remedied is supported by its findings of fact and not clearly erroneous, we need not reach the issue of whether continuation of the parent-child relationship poses a threat to Child's well-being. Additionally, Parents do not challenge the trial court's conclusion that termination is in the best interests of Child.

[31] Parents' remaining challenge concerns the trial court's conclusion that there is a satisfactory plan for Child's care and treatment. To be "satisfactory" for the purposes of the termination statute, a plan "need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*. A plan of adoption is satisfactory even if DCS has not identified a specific adoptive family. *Id.* "In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent." *Id.*

[32] In this case, Child has been cared for by the same foster family since his removal in October 2013. The foster family was prepared to adopt Child but due to unforeseen circumstances in the months leading up to the fact-finding hearing, they were no longer in a position to adopt. Child's foster mother testified, however, that they would care for him until an adoptive family is found. FCM Hughes testified that DCS's plan for Child was adoption through the Special Needs Adoption Program (SNAP). The CASA detailed the SNAP

process and opined that "there will be a lot of people express interest in [Child]." *Transcript* at 173.

[33] The trial court found that DCS's plan of adoption was satisfactory for the purposes of the termination statute. We agree, as the plan offered by DCS gave a general sense of the direction for Child's care and treatment following termination. *See Lang*, 861 N.E.2d at 374-75.

[34] For the foregoing reasons, we affirm the trial court's termination of Parents' parental rights to Child.

[35] Judgment affirmed.

[36] Bradford, J. and Pyle, J., concur.